UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


BRIAN E. W.[1]                                                    Case No. 6:18-cv-544-AC

                              Plaintiff,                          OPINION AND ORDER

              v.

COMMISSIONER, Social Security
Administration,

                              Defendant.
_____

ACOSTA, Magistrate Judge:

    Plaintiff Brian E. W. ("Plaintiff") filed this action under section 205(g) of the Social Security

Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner

of Social Security (the "Commissioner") who denied him supplemental security income benefits

("SSI Benefits").    The court finds the Commissioner erred by not justifying his rejection of

[1]In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party in this case.

Plaintiff's treating physician's opinion that Plaintiff is limited to occasional reaching and, as a result, relying on vocational expert testimony based on an incomplete hypothetical. Accordingly, the Commissioner's final decision is reversed and remanded for further proceedings consistent with this Opinion and Order.

*Procedural Background*

On or about March 13, 2014, Plaintiff protectively filed an application for SSI Benefits alleging an onset date of July 27, 2013. The application was denied initially, on reconsideration, and by the Administrative Law Judge (the "ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

*Factual Background*

Plaintiff is fifty-five years old. He obtained the equivalent of a high-school education. His past relevant work experience includes farm worker, construction laborer, and agricultural packer. Plaintiff has not been involved in a successful work attempt since July 27, 2013. Plaintiff alleges disability because of back and leg problems, and chest and hip pain.

I. Testimony

Plaintiff claims he became disabled on July 23, 2013, the date of his last successful work attempt. However, Plaintiff did not stop working for medical reasons in July 2013, but was laid off when his employer retired. (Tr. of Social Security Administrative R., ECF No. 13 ("Admin. R."), at 174.) Shortly after his last day of work, Plaintiff fell fifty feet down a steep hill onto a concrete pad and hurt his upper back.[2] (Admin. R. at 36-37.) He did not seek medical treatment for his

---

[2]In 1992, Plaintiff broke six vertebrae in his lower back and currently has some issues in that area, which he believes are likely due to arthritis. (Admin. R. at 53.)

injuries, assuming they would just take some time to heal and medical care would not hasten or temper the healing process. (Admin. R. at 229.) Plaintiff started having issues with his left shoulder in February 2016, after attending an osteopathic manipulation session for his upper back and right shoulder. (Admin. R. at 51-52.)

In his Function Report dated April 22, 2014, Plaintiff reported constant pain from his hips to his shoulders regardless of his activity level. (Admin. R. at 179.) He indicated he intermittently suffers from breathing problems, ringing in his ears, light-headedness, chest pains, and anxiety. (Admin. R. at 179.) He is able to care for himself and between periods when he is resting, stretching, or in pain, he prepares his meals; cleans the kitchen; loads the dishwasher; feeds, waters, picks up after, and walks his dogs for fifteen to twenty minutes in nice weather; provides transportation and runs errands for his roommate, who does not drive; and shops for groceries and does laundry on a weekly basis. (Admin. R. at 180-82.)

Plaintiff enjoys playing with his dogs, although not as aggressively or for as long as before his injury, watching television and movies, listening to the stereo, and socializing with friends a few times a week. (Admin. R. at 183.) He is no longer able to pick up heavy items, walk long distances, or stand or sit for long periods, and has difficulty sleeping. (Admin. R. at 180.) Plaintiff represented his medical conditions prevent him from lifting more than fifteen pounds, walking more than twenty minutes, standing more than an hour, sitting more than two hours, squatting or bending more than a few moments, kneeling more than two minutes, or concentrating for more than short time. (Admin. R. at 184.) In April 2014, Plaintiff's medications were limited to Ibruprofen. (Admin. R. at 185.)

At the time of the hearing in December 2016, Plaintiff lived with his girlfriend, Linda Davis,

his friend, John Henparn, and nine dogs (two adult Pit Bulls, one adult German Shepherd, Pit Bull mix, and six puppies. (Admin. R. at 42-44.) On a typical day, Plaintiff stretches each morning to help with his back, hip and shoulder pain while drinking coffee, cleans up the kitchen while taking regular rest breaks, lets the dogs outside, cleans up the dog's mess inside, walks around the yard cleaning up the mess outside, and then listens to music. (Admin. R. at 54-55.) He helps Davis with the grocery shopping, using the cart for support while walking, drives home after stretching a bit in the car, and, as much as possible, helps transport the groceries into the house. (Admin. R. at 55.) He has difficulty sleeping at night and wakes up every two hours with hip and shoulder pain. (Admin. R. at 55.)

Plaintiff testified he is unable to lift more than ten pounds from the ground without having to push on something to straighten, stand for more than two hours due to lower hip pain and right leg numbness, or walk for more than block due to upper back pain. (Admin. R. at 48-50.) Plaintiff represented he used anti-inflammatories and nerve medications, as well as muscle relaxants when he can afford them, only some of which provide some pain relief. (Admin. R. at 46-47.)

## II. Medical Evidence

The earliest medical record offered in support of Plaintiff's claim is the review of an x-ray of Plaintiff's lumbar spine dated June 30, 2014. (Admin. R. at 221.) The x-ray revealed degenerative changes in "essentially all lumber levels with disc height loss and osteophyte formation" leading to a diagnosis of "[m]ultilevel lumber discogenic degenerative changes at essentially all lumber levels" but "most prominent at L3-L4." (Admin. R. at 221.) The vertebral body height and alignment, and posterior elements were intact; the sacrum and sacroiliac joints were unremarkable, and there was no evidence of a significant compression deformity. (Admin. R. at

221.)

On July 9, 2014, James E. Heder, M.D. examined Plaintiff at the request of the Commissioner. (Admin. R. at 229.) Plaintiff reported back pain limited his ability to walk, reach, and pull, and prevented him from getting a good night's sleep. (Admin. R. at 229.) Plaintiff informed Dr. Heder he was a regular smoker and enjoyed two to five beers per day, but he denied using street drugs. (Admin. R. at 230.) Dr. Heder noted Plaintiff had no difficulty walking to the examination room, removing his shoes, or transferring from the chair to the examination table. (Admin. R. at 231.) He observed Plaintiff had a normal gait, no difficulty walking toe to heel, hopping on both feet, or squatting, but did get shaky with tandem walking. (Admin. R. at 231-32.) Dr. Heder indicated:

> There are no paravertebral muscle spasms, tenderness, crepitus, or effusions. He does have an "S" shape scoliosis of the thoracic lumbar spine. It is open to the left in the lumbar area and open to the right in the thoracic area. His right shoulder significantly drops off compared to the left, which appears to be due to the scoliosis.
>
> *   *   *
>
> Strength 5/5 in the upper and lower extremities bilaterally. Grip strength is 5/5 bilaterally. Normal muscle bulk and tone. No atrophy noted.

(Admin. R. at 233.) Dr. Heder diagnosed Plaintiff with "thoracic lumbar spine dysfunction" which limited Plaintiff's ability to stand, walk, or sit to a maximum of six hours. (Admin. R. at 233.) Dr. Heder did not identify any additional restrictions, noting Plaintiff was not limited in his ability to lift, carry, climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, and feel. (Admin. R. at 233.)

Later that month, Neal E. Berner, M.D., reviewed Plaintiff's application and function report, and Dr. Heder's conclusions, and found Plaintiff's residual functional capacity was limited to "medium" exertion with additional limitations to account for Plaintiff's reports of pain. (Admin. R.

at 72-75.)  Dr. Berner found Plaintiff could occasionally lift and carry fifty pounds; frequently lift and carry twenty-five pounds; stand, walk, and sit for six hours in an eight-hour day with normal breaks; and push and pull frequently, but not constantly, based on limitations in Plaintiff's upper extremities.  (Admin. R. at 77.)  Dr. Berner considered Plaintiff unlimited in his ability to climb ramps or stairs, balance, stoop, kneel, and crouch, but restricted him to crawling frequently and climbing ladders, ropes, and scaffolds occasionally.  (Admin. R. at 77.)  Richard Alley, M.D., performed a second review of Plaintiff's records and in a report dated February 4, 2015, concurred with the limitations identified by Dr. Berner.  (Admin. R. at 88.)

The first report of Plaintiff's treating physician, John R. Ward Jr., M.D., is dated April 22, 2015.  (Admin. R. at 244.)  Plaintiff sought medical assistance for his chronic back and neck pain. (Admin. R. at 244.)  Dr. Ward noted spasm and tenderness along the cervical and lower lumbar paraspinous muscles, with strength intact in the upper extremities and some decreased sensation to light touch along the right lateral thigh.  (Admin. R. at 245.)  Dr. Ward indicated  "Plaintiff has not had medical care in quite some time,"[3] ordered x-rays, and prescribed salsalate.  (Admin. R. at 247.) The results of the x-rays of Plaintiff's lumbar spine were "similar to that seen on the prior exam," with evidence of discogenic degenerative changes, disc loss, and osteophyte formation at all lumbar levels, and slight anterolisthesis of L4 under L3 and L5 under L4.  (Admin. R. at 278.)  However, there was "no significant compression deformity observed."  (Admin. R. at 278.)  X-rays of Plaintiff's hip were found to be normal and x-rays of his thoracic spine revealed multilevel thoracic degenerative changes with no significant compression deformity.  (Admin. R. at 279-80.)

---

[3]Dr. Ward  specifically stated Plaintiff "hasn't seen a doctor through adulthood."  (Admin. R. at 244.)

Plaintiff returned to Dr. Ward on May 6, 2015, and reported the salsalate was not providing effective pain relief. (Admin. R. at 249.) Dr. Ward prescribed physical therapy, to which Plaintiff appeared open, naproxen as a replacement for sasalate, and intermittent tramadol. (Admin. R. at 249.) Additionally, in light of Plaintiff's continued reports of pain, Dr. Ward requested additional testing to screen for inflammatory arthritis. (Admin. R. at 249.) A month later, Plaintiff indicated the tramadol made him dizzy, the naproxen cause him to bleed more, and the physical therapy was not very helpful. (Admin. R. at 251.) Dr. Ward discontinued the tramadol and naproxen, and prescribed hydrocodone-acetaminophen. (Admin. R. at 251.) The recent blood work revealed a minimally elevated ANA,[4] which Dr. Ward found reassuring and not clinically significant. (Admin. R. at 251.)

In early July 2015, Plaintiff informed Dr. Ward both he and his physical therapist did not feel physical therapy was helpful . (Admin. R. at 254.) Plaintiff explained he continued to have trouble sleeping on his sides and was having a burning sensation down his right leg. (Admin. R. at 254.) Dr. Ward did not consider Plaintiff's radicular symptoms consistent enough to warrant an MRI and was interested in obtaining another opinion on pain management methods. (Admin. R. at 254.) He referred Plaintiff to a back pain specialist and refilled the hydrocodone-acetaminophen prescription with slight changes. (Admin. R. at 254.)

On September 4, 2015, Dr. Ward reported the specialist to which he referred Plaintiff "doesn't feel like he has a lot to add if patient continues to smoke marijuana and drink." (Admin. R. at 255.) He explained to Plaintiff the risks of taking pain medication while drinking and using cannabis, and advised Plaintiff he should stop taking his hydrocodone. (Admin. R. at 256.) Plaintiff,

---

[4]ANA, or antinuclear antibodies, are an indication of rheumatoid arthritis.

who expressed a desire to continue using the hydrocodone intermittently, committed to decreasing his drinking and drug use when advised the failure to do so would result in the revocation of the hydrocodone prescription. (Admin. R. at 256.) In November 2015, Plaintiff sought treatment for rectal bleeding due to hemorrhoids. (Admin. R. at 239-40.) At that time, Plaintiff reported he drank six or more beers daily and used cannabis twice daily. (Admin. R. at 239.)

In December 2015, Plaintiff informed Dr. Ward he was dismissed from treatment at a pain clinic because he continued to drink six sixteen-ounce beers and smoke marijuana three times daily. (Admin. R. at 257.) Plaintiff again reported he did not consider physical therapy or heat to be helpful. (Admin. R. at 257.) He stated when his back "pops," his right shoulder hurts, and that the pain comes and goes fairly rapidly. (Admin. R. at 257.) He also reported difficulty sleeping and occasional cramping in his hands and feet. (Admin. R. at 239.) Dr. Ward discontinued the hydrocodone prescription and encouraged Plaintiff to decrease his alcohol intake but noted Plaintiff did not seem ready to take that step. (Admin. R. at 258.) Dr. Ward suggested Plaintiff take ibuprofen and use gabapentin at night. (Admin. R. at 258.) Two months later, Plaintiff was taking ibruprofen and gabapentin up to three times a day and thought the gabapentin was moderating the pain at night and helping him sleep. (Admin. R. at 259.) Dr. Ward increased the gabapentin prescription and referred Plaintiff for osteopathic treatment. (Admin. R. at 260.)

By May 4, 2016, Plaintiff reported having issues with his left shoulder, which he attributed to his osteopathic treatment. (Admin. R. at 260.) Plaintiff thought the osteopathic manipulations were not helpful, but rather exacerbated his pain, describing a situation where he felt and heard a pop in his back resulting in continuous grinding pain which would not subside. (Admin. R. at 260.) He also reported little to no relief from the ibuprofen and gabapentin, despite doubling or tripling the

prescribed dose. (Admin. R. at 261.) Dr. Ward prescribed meloxiam in place of ibuprofen and recommended Plaintiff continue gabapentin. (Admin. R. at 239.) Dr. Ward also ordered additional x-rays of Plaintiff's thoracic spine, which were taken on May 4, 2016, and were consistent with the prior x-rays. (Admin. R. at 262, 281.)

Plaintiff's pain complaints continued in August 2016. (Admin. R. at 264.) He described continued pain in his left shoulder and increased pain in his hips. (Admin. R. at 264.) He was unhappy with the meloxicam, explaining it was not as effective as the ibuprofen. (Admin. R. at 264.) Dr. Ward thought Plaintiff's pain seemed "muscular in origin" and not "amendable to a trigger point injection." (Admin. R. at 264.) Dr. Ward recommended Plaintiff return to ibuprofen and continue with baclofen and gabapentin. (Admin. R. at 264.) However, at an October 31, 2016 appointment, Plaintiff expressed dissatisfaction with the baclofen. (Admin. R. at 266.) He reported a decrease in pain with hydrocodone prescribed by a dentist who performed some teeth extractions. (Admin. R. at 266.) Dr. Ward again informed Plaintiff he did not consider narcotics a viable treatment option for Plaintiff's chronic pain. (Admin. R. at 266.) He encouraged Plaintiff to "continue to be physically active" and continue his gabapentin at night, and recommended discontinuing any medication that is not providing relief. (Admin. R. at 266.) Dr. Ward expressed a desire for a second opinion on the cause of Plaintiff's upper back and shoulder pain. (Admin. R. at 266.)

On November 21, 2016, Dr. Ward completed a Physician's Assessment of Physical Capabilities for Plaintiff. (Admin. R. at 282.) Dr. Ward opined Plaintiff could sit or stand for two hours at a time and a total of six hours in an eight-hour work day; walk less than an hour at a time and an hour total in an eight-hour workday; lift up to five pounds frequently and ten pounds

occasionally; and reach, bend, and climb occasionally. (Admin. R. at 282.) Dr. Ward noted "[d]ue to multiple, complex pain complaints patient needs a full functional capacity exam." (Admin. R. at 282.) That same day, Dr. Ward listed Plaintiff's current medications as cyclobenzaprine, for muscle spasms and shoulder pain, gabapentin, and ibuprofen. (Admin. R. at 283.) Dr. Ward asked Plaintiff to "follow up with Dr. Potter to consider injections." (Admin. R. at 283.)

III. Vocational Evidence

Jeffrey Tittelfitz ("Tittelfitz") participated in the hearing by telephone and testified as a vocational expert. The ALJ asked Tittelfitz if an individual approaching advanced age with a GED; who is capable of performing a range of light work; and with the ability to lift, carry, push, or pull twenty pounds occasionally from waist level and ten pounds from ground level; stand, sit and walk six hours cumulatively in an eight-hour workday with a cumulative one-hour limit on walking at a distance of a few blocks at a time; and occasionally stoop, crouch, and crawl, and climb ladders, ropes, or scaffolding could perform substantial gainful activity. (Admin. R. at 61-62.) Tittelfitz testified such individual would not be able to perform Plaintiff's past relevant work. (Admin. R. at 62.) However, Tittelfitz testified an individual with such limitations could work as a marker, assembler, or electronics worker, which he classified as light work requiring lifting of no more than ten pounds with a sit-stand option and minimal walking. (Admin. R. at 62-63.) In response to a question posed by Plaintiff's counsel, Tittelfitz testified the addition of a restriction to only occasional reaching in all directions would prevent the described individual from performing each of the previously identified jobs, which all require the ability to frequently or constantly reach forward, if not overhead. (Admin. R. at 64.)

IV. ALJ Decision

In his decision issued March 27, 2017, the ALJ concluded Plaintiff had not been suffering from a disability within the meaning of the Act since the March 13, 2014 filing date. (Admin. R. at 14.) The ALJ, who conceded Plaintiff had not engaged in substantial gainful activity since March 13, 2014, found Plaintiff suffered from the severe impairments of degenerative disc disease of the lumbar and thoracic spine but retained the residual functional capacity to perform a reduced range of light work, which included the ability to lift, carry, push or pull twenty pounds occasionally when working from waist level and ten pounds when working from the ground; stand and sit for six hours, and walk a few blocks at a time for a total of one hour, in an eight-hour workday; and occasionally stoop, crouch, crawl, and climb ladders, ropes and scaffolding. (Admin. R. at 16-17.) The ALJ believed Plaintiff was unable to perform his past relevant work of farm worker, construction worker, and agricultural packer, but could perform other work identified by the vocational expert, such as marker, small products assembler, or electronics worker, which exists in significant numbers in the national economy. (Admin. R. at 20-21.) Accordingly, the ALJ concluded Plaintiff was not disabled under the Act at any time since March 13, 2014. (Admin. R. at 22.)

The ALJ acknowledged Plaintiff's medically determinable impairments could reasonably cause some of the symptoms and limitations described by Plaintiff, but found the Plaintiff's statements with regard to the intensity, persistence, and extent of the resulting limitations were not entirely consistent with the evidence in the record. (Admin. R. at 17-18.) The ALJ noted that while Plaintiff claimed to be disabled as of July 27, 2013, Plaintiff stopped working at that time because he was laid off, not because of his medical impairments. (Admin. R. at 18.) He also commented on Plaintiff's failure to seek medical treatment for nearly two years after his alleged onset date, which

the Plaintiff attributed to a lack of insurance. (Admin. R. at 18.) When Plaintiff did seek treatment in April 2015, Dr. Ward prescribed routine and conservative treatment methods, such as manipulative and physical therapy, which apparently provided little relief of Plaintiff's pain and other symptoms. (Admin. R. at 18.) While Plaintiff reported some pain relief with hydrocodone, he elected to discontinue his use of the medication in favor of continued enjoyment of alcohol and marijuana. (Admin. R. at 18.) Moreover, Dr. Ward encouraged Plaintiff to engage in physical activities in 2016, despite Plaintiff's reports of ongoing back pain. (Admin. R. at 18.) Dr. Ward did not consider Plaintiff's symptoms consistent enough to warrant an MRI or surgery and Plaintiff was never hospitalized. (Admin. R. at 18-19.) Finally, the ALJ noted that despite Plaintiff's allegations he was unable to work due to his medical limitations, Plaintiff reported he was able to independently maintain his personal care, prepare meals, perform household chores, shop, manage finances, taxi his roommate around town, care for nine dogs, and socialize with friends. (Admin. R. at 19.) The ALJ concluded the inconsistencies between Plaintiff's alleged onset date, work history, objective findings, treatment records and recommendations, and daily activities all undermined Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his pain and symptoms. (Admin. R. at 18-19.)

The ALJ essentially agreed with the limitations described by Dr. Ward in his Physician's Assessment of Physical Capabilities with the exception of the weight limitation for lifting, carrying, pushing, and pulling from the waist level and above. (Admin. R. at 19.) The ALJ explained:

> In November 2016, Dr. Ward filled out a medical source statement indicating that the claimant could lift and carry 10 pounds occasionally and 5 pounds frequently (Ex. 6F.) He could sit and stand, each for two hours at a time for a total of 6 hours each in an 8-hour workday. He could walk for less than 1 hour at a time for a total of 1 hour in an 8-hour workday. Although Dr. Ward admits that his opinion is based

largely on the claimant's subjective reports of pain, the record documents severe spinal disease that could reasonably cause the claimant's pain. Furthermore, Dr. Ward has a longstanding treating relationship with the claimant, and his opinion about the nature, diagnoses, and severity of the claimant's impairments is generally consistent with the overall medical evidence of record. However, based on the claimant's testimony, I find the claimant is able to lift, carry, push, and pull up to 20 pounds occasionally from waist level and above.

(Admin. R. at 19.) The ALJ rejected the limitations identified by Dr. Heder and the State agency medical consultants to the extent they were not as severe as those he identified based on the additional evidence received at the hearing level, including recent treatment records and Dr. Ward's assessment. (Admin. R. at 19-20.)

*Standard of Review*

The Act provides for payment of SSI Benefits to individuals who are age sixty-five or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a) (2019). The burden of proof to establish a disability rests upon the claimant. *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. § 1382c(a)(3)(A) (2019). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B) (2019).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for SSI Benefits because he or she is disabled. 20 C.F.R. § 416.920 (2019);

*Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, SSI Benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If the claimant does not have a severe impairment or combination of impairments, SSI Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past. If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and SSI Benefits are denied. 20 C.F.R. § 416.920(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Drouin*, 966 F.2d at 1257. The claimant is entitled to SSI Benefits only if he or she is not able to perform other work. 20 C.F.R. § 416.920(f).

When an individual seeks SSI Benefits because of disability, judicial review of the Commissioner's decision is guided by 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3) (2019). The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g) (2006); *Batson* v. *Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins* v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1 545(a)(3), 416.945(a)(3); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). However, the reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by

isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007).

*Discussion*

Plaintiff asserts the ALJ erred by: 1) improperly rejecting the functional limitation of occasional reaching identified by Dr. Ward, Plaintiff's treating physician; 2) improperly discounting Plaintiff's testimony regarding his pain and resulting limitations; and 3) relying on vocational testimony based on an incomplete hypothetical. Plaintiff asks the court to credit the testimony improperly rejected by the ALJ and remand this action to the Commissioner for an award of SSI Benefits. The Commissioner contends the ALJ properly considered the evidence presented to him in accordance with the terms of the Act and related regulations, and that his decision should be affirmed.

I. Dr. Ward's Reaching Limitation

The weight attributable to the opinion of a medical source depends, in part, on the professional relationship between the physician and the claimant. Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than that of a physician who did not examine the claimant but formed an opinion based on a review of the claimant's medical records. *Holohan v. Massanari*, 246 F.3d 1195, 1201-1202 (9th Cir. 2001).

The ALJ can reject a treating or examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Thomas v.*

*Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An uncontradicted opinion may be rejected only for clear and convincing reasons. *Thomas*, 278 F.3d at 956-957.

The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996). It may constitute substantial evidence if it is consistent with other evidence in the record. *Magallanes v. Bowen,* 881 F.2d 747, 752 (9th Cir. 1989). Furthermore, an ALJ need not accept a physician's opinion that is brief, conclusory or inadequately supported by clinical findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216. Additionally, if a claimant is found not credible, an ALJ may appropriately disregard statements the claimant made to his physicians. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

The ALJ gave "substantial weight" to Dr. Ward's November 2016 medical source statement that identified numerous restrictions, including occasional lifting, carrying of no more than ten pounds, and occasional reaching. The ALJ expressly rejected the examining and reviewing physician's opinions on Plaintiff's limitations to the extent they were not a severe as the limitations identified by Dr. Ward and found Dr. Ward's longstanding treatment of Plaintiff and his "opinion about the nature, diagnoses, and severity of the [Plaintiff's] impairments is generally consistent with the overall medical evidence of record" which document "severe spinal disease that could reasonably cause the claimant's pain." The ALJ's only express modification of Dr. Ward's assessment was an increase in the weight Plaintiff was able to lift, carry, push, and pull up to twenty pounds occasionally from waist level and up, based on Plaintiff's testimony. However, the ALJ also omitted Dr. Ward's limitation on occasional reaching in his description of Plaintiff's residual functional capacity without providing an explanation for such omission. The ALJ's failure to explain the

reasons for this omission is clear error.

While Dr. Ward's restrictions were more limited than those identified by Dr. Heder, Dr. Berner, and Dr. Alley and, to that extent, were contradicted, the ALJ specifically rejected the lesser limitations in favor of Dr. Ward's stated limitations. Consequently, the ALJ was required to, at a minimum, "make findings setting forth specific, legitimate reasons . . . based on substantial evidence in the record" if he rejected Dr. Ward's opinion. He failed to do so.

The Commissioner argues because the ALJ gave Dr. Ward's opinion substantial, not controlling, weight, he did not need to include all of the limitations identified by Dr. Ward in the residual functional capacity assessment. Similarly, the Commissioner contends that because determining the residual functional capacity is an administrative assessment reserved for the ALJ, medical opinions are not controlling on this issue and the ALJ did not need to incorporate all of the limitations described by Dr. Ward in his description of Plaintiff's residual functional capacity. Even so, the ALJ is not free to ignore limitations supported by the medical record. If the ALJ omits a limitation from his residual functional capacity determination, that omission must be justified. Here, after finding Dr. Ward's opinion was supported by his longstanding treatment of Plaintiff and Plaintiff's medical record, the ALJ failed to discuss why he omitted Dr. Ward's occasional reaching limitation from his residual functional capacity assessment. The ALJ was not free to simply disregard the limitation, especially considering the probative weight he gave Dr. Ward's opinion.

The Commissioner alternatively argues the ALJ's rejection of the reaching limitation, after specifically noting Dr. Ward's opinion that Plaintiff could reach only occasionally and hearing the hypothetical including the limitation, establishes the ALJ clearly discounted the limitation as inconsistent with the overal medical record. Conceding the ALJ's explanation of his thought process

with regard to the limitation could have been better, the Commissioner, relying on *Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012), asserts the court must uphold the ALJ's decision if his "path may reasonably be discerned." In *Molina*, the court explained "if an ALJ has provided well-supported grounds for rejecting testimony regarding specific limitations, we cannot ignore the ALJ's reasoning and reverse the agency merely because the ALJ did not expressly discredit each witness who described the same limitations." *Id*. The sole reference in the ALJ's opinion to Plaintiff's ability to reach was with regard to the limitation imposed by Dr. Ward. The ALJ did not discuss testimony or other evidence regarding the reaching limitation and failed to provide well-supported grounds for rejecting the limitation with regard to any witness. Consequently, *Molina* is distinguishable and inapposite to the matter at hand. Moreover, "[l]ongstanding principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ – not *post hac* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F3d. 1219, 1225 (9th Cir. 2009).

## II. Plaintiff's Testimony

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017); 20 C.F.R. § 416.929 (2019). The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Molina*, 674 F.3d at 1112; *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage, absent affirmative evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155,

1160 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).

The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony. *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2013); *Tommasetti*, 533 F.3d at 1039.

Plaintiff identifies Dr. Ward's heavy reliance on Plaintiff's subjective testimony as a possible justification for the ALJ's rejection of the reaching limitation. However, in his responsive brief, the Commissioner asserts the ALJ did not conclude Dr. Ward improperly relied on Plaintiff's reports of his symptoms. Rather, the Commissioner identifies medical records which support Plaintiff's subjective pain testimony and notes the ALJ relied on Plaintiff's reports as a justification for crediting Dr. Ward's testimony. In light of the Commissioner's concession, and the court's determination the ALJ erred when he failed to provide legally sufficient reasons to reject the reaching limitation identified by Dr. Ward, the arguments regarding Plaintiff's subjective pain testimony are moot and need not be addressed.

## III. Incomplete Hypothetical

"While the claimant has the burden of proof at steps one through four, the burden of proof shifts to the [Commissioner] at step five to show that the claimant can do other kinds of work." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009) (citations omitted). The Commissioner shows that a claimant is capable of working by determining the claimant's residual functional capacity and posing hypothetical questions to a vocational expert that incorporate the

claimant's limitations. *Id.* The vocational expert lists jobs the hypothetical claimant is capable of performing, and the ALJ determines, "given the claimant's [residual functional capacity], age, education, and work experience," if there are jobs in the national economy the claimant can perform. *Id.* The Commissioner must identify "specific jobs existing in substantial numbers in the national economy that [a] claimant can perform despite [his] limitations." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). To have any evidentiary value, vocation expert testimony must be based upon a complete hypothetical incorporating the entirety of a claimant's impairments. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

The hypothetical posed by the ALJ to Tittelfitz did not include a limitation on Plaintiff's ability to reach. Because the court finds the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Wade's opinion that Plaintiff was limited to occasional reaching, the ALJ failed to incorporate all of Plaintiff's limitations into his description of Plaintiff's residual functional capacity. Thus, the questions posed to the vocational expert by the ALJ at step five were not based on substantial evidence, and the vocational expert's answers to the ALJ's hypothetical are of no evidentiary value. *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). The ALJ relied on Tittelfitz's answer to the incomplete hypothetical in finding Plaintiff retained the ability to perform the jobs of marker, small products assembler, or electronics worker. Consequently, the Commissioner failed to meet its burden to show Plaintiff was capable of performing jobs existing in substantial numbers in the national economy despite his limitations.[5] This is particularly true in

---

[5]In a similar case, the Commissioner conceded the ALJ erred when he failed to include in the hypothetical posed to the vocational expert a reaching limitation identified by the treating physician despite giving the treating physician's testimony and opinion significant weight. *Woods v. Comm'r Soc. Sec. Admin.*, No. 6:14-cv-01766-HZ, 2015 WL 8780538, at *3 (D. Or. Dec. 14, 2015).

light of Tittelfitz's testimony Plaintiff could not perform the jobs identified by the ALJ if he was limited to occasional reaching.

## IV. Remand

Plaintiff asks the court to credit the evidence wrongly rejected by the ALJ and remand this matter to the Commissioner for an immediate award of SSI Benefits. The Commissioner argues substantial evidence in the record supports the ALJ 's decision to omit a reaching limitation from the hypothetical and the ALJ properly relied on Tittelfitz's answer to the hypothetical in finding Plaintiff retained the ability to perform the jobs of marker, small products assembler, or electronics worker.

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harmen v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1138–39 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) ). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the

claimant disabled were such evidence credited. *Id*. The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett*, 340 F.3d at 876 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (*en banc*)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

Here, the first element of the credit-as-true doctrine is satisfied, as the ALJ erred in his rejection of Dr. Ward's occasional reaching limitation. However, the error is based solely on the ALJ's failure to provide his reasons for rejecting the limitation, not a lack of available contrasting evidence in the record with regard to the existence, extent, or duration of the limitation. On remand, the ALJ should examine the record and expressly accept or reject Dr. Ward's opinion with regard to Plaintiff's ability to reach. If the ALJ rejects the opinion, he must explain his reasons for doing so.

<em>Conclusion</em>

The Commissioner erred in rejecting Dr. Ward's opinion on Plaintiff's ability to reach without providing reasons for doing so and, as a result, relying on vocational expert testimony based on an incomplete hypothetical. Accordingly, the Commissioner's final decision is REVERSED and REMANDED for further proceedings consistent with this Opinion and Order.

DATED this 30th day of July, 2019.

        /s/ John V. Acosta
          JOHN V. ACOSTA
      United States Magistrate Judge